# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| PAUL ANTHONY SELBY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY A. BERRYHILL, Acting ) <br> Commissioner of Social Security,[1] ) <br> ) <br> Defendant. ) | NO. 1:13-cv-00146 <br> CHIEF JUDGE CRENSHAW |

## MEMORANDUM OPINION

Pending before the Court in this Social Security action is Paul Anthony Selby's Motion for Judgment on the Administrative Record (Doc. No. 12), to which the Commissioner of Social Security has responded (Doc. No. 13). Upon consideration of these filings and the transcript of the administrative record (Doc. No. 10),[2] and for the reasons given below, Selby's motion for judgment will be **DENIED** and the decision of the Commissioner will be **AFFIRMED**.

## I.   Statement of the Case

Selby filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act on September 30, 2010, alleging disability onset as of January 1, 2009, due to back and hip problems. (Tr. 12, 138.) Tennessee Disability Determination Services denied Selby's claims upon initial review and again following his request for reconsideration. Selby subsequently requested de novo review of his case by an Administrative

---

[1]   Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin in that role. Berryhill is therefore appropriately substituted for Colvin as the defendant in this action, pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g).

[2]   Referenced hereinafter by page number(s) following the abbreviation "Tr."

Law Judge ("ALJ"). The ALJ heard the case on July 23, 2012, when Selby appeared with counsel and gave testimony. (Tr. 27–43.) A vocational expert also testified at the hearing. At the conclusion of the hearing, the ALJ took the matter under advisement until August 21, 2012, when he issued a written decision finding Selby not disabled. (Tr. 12–21.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative joint disease of the left hip and lumbar radiculopathy (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant is unable to bend, stoop, or squat frequently. The claimant is unable to operate foot controls on a frequent basis. The claimant is unable to handle excessive vibrations. The claimant is unable to work around heights or moving, dangerous machinery.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 11, 1959 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14, 16, 19–20.)

On September 24, 2013, the Appeals Council denied Selby's request for review of the ALJ's decision (Tr. 1–3), rendering that decision final. This civil action seeking review was timely filed on November 20, 2013. 42 U.S.C. § 405(g).

## II. Statement of the Facts

The following record review is taken from the Government's brief (Doc. No. 13, PageID# 292–96):[3]

### A. Medical Evidence of Record

On June 16, 2010, Selby established treatment at Cumberland Dermatology for complaints of spots on his arms (Tr. 227). Selby reported that the spots had been present for several months; they did not itch or cause pain (Tr. 227), but were sore (Tr. 228). Selby reported no other medical conditions (Tr. 227), and he denied any muscle weakness, joint aches, or bone problems (Tr. 228). Scott Stout, a physicians' assistant-certified (PA Stout), diagnosed actinic keratosis, applied liquid nitrogen to 13 spots, and instructed Selby to return in four to six weeks if the spots did not fully resolve (Tr. 227). Selby may have also reported a lesion on his right ankle; he declined any treatment due to lack of insurance (Tr. 228).

On July 15, 2010, Selby returned to Cumberland Dermatology (Tr. 228). He stated that some of the spots improved with the liquid nitrogen, but he also admitted to picking at the areas (Tr. 228). Selby again reported no other medical conditions (Tr. 229). Selby declined a biopsy of the lesion on his right ankle, even though PA Stout stated that the lesion could be cancerous (Tr. 229). A physical examination showed no joint swelling or deformity (Tr. 230). PA Stout prescribed a cream and instructed Selby to return in two to three weeks (Tr. 229–30). Selby expressed concern with the cost of the medication, and PA Stout informed him that he could have the

---

[3] The Court relies upon the Government's summary of the medical evidence because it is more extensive than that provided in Selby's brief (Doc. No. 12-1) and does not conflict with Selby's statement in any material way.

prescription compounded at Vital Care Pharmacy (Tr. 230). There is no evidence in the administrative transcript that Selby returned to Cumberland Dermatology.

On September 21, 2010, Selby visited Matthew Bolton, M.D., with complaints of left hip pain and left leg numbness (Tr. 205–07). Selby stated that these symptoms began on May 1, 2010 (Tr. 205). He described the pain as intermittent and stabbing, and rated the pain as a 7 out of 10 (Tr. 205). He reported worse pain within the past three days, which coincided with him starting work at a chicken hatchery (Tr. 205). He reported that he would get moderate hip pain by lunch time, and would have trouble getting into his truck at the end of the day (Tr. 205).[4] Selby had tenderness of the sacroiliac joint, mild tenderness with internal rotations of the left leg, and moderate tenderness with external rotation of that leg (Tr. 206). There was no tenderness in the right leg, and Selby ambulated without assistance (Tr. 205). Dr. Bolton diagnosed mild to moderate degenerative joint disease of the left hip, prescribed Prednisone, and instructed Selby to return to the clinic as needed (Tr. 207). There is no evidence in the administrative transcript that Selby returned to Dr. Bolton.

On February 14, 2011, Donita Keown, M.D., performed a consultative physical examination (Tr. 209–11). Selby reported left hip pain as his main problem (Tr. 209). He reported that the pain began four or five years ago and had progressively gotten worse (Tr. 209). He stated that he got sharp pain out of his lower back and into the left leg, more so when walking or standing, but also when sitting (Tr. 209). He was not taking any medications and had not had any injections or other treatment (Tr. 209). Dr. Keown observed actinic keratotic lesion of the left and right forearms and dorsal aspects of both hands (Tr. 210). Selby walked with a slight left-sided limp, but he needed no assistive device (Tr. 210). Dr. Keown observed no impairment "during Romberg test, one-foot stand on right foot, toe lift or heel walk" (Tr. 211). Selby had full range of motion in the hands, wrists, elbows, shoulders, hips, knees, and ankles (Tr. 210). A straight leg raise test was negative (Tr. 210). Left hip flexion was 110 degrees; internal and external rotation were 40 and 50 degrees; and abduction was 40 degrees without complaints (Tr. 211). Dr. Keown diagnosed chronic low back pain that may be attributable to early degenerative changes; left hip pain that may be attributable to early degenerative changes; and mildly diminished left foot pulses (Tr. 211).

On that same day, Dr. Keown completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) (Tr. 212–17). Dr. Keown opined that Selby could occasionally carry 51-100 pounds and frequently lift 51-100 pounds; could sit eight hours in a work day, with two hours at a time without interruption; could stand seven hours in a workday, with one hour at a time without interruption; could walk seven hours in a workday, with one hour at a time without interruption; could continuously balance and use his hands and feet; could occasionally crouch and crawl; and could frequently stoop, kneel, and climb (Tr. 212–14).

---

[4] Selby notes that he assessed his pain at this time at seven on a scale of ten. (Doc. No. 12-1, PageID# 278.)

On March 1, 2011, Frank R. Pennington, M.D., a state agency physician, reviewed the documentary evidence and opined that Selby did not have a severe physical impairment (Tr. 218–23). Dr. Pennington stated that this opinion was consistent with Dr. Keown's examination and Selby's self-reported activities (Tr. 161–64, 221).

On May 6, 2011, Michael Ryan, M.D., a state agency physician, reviewed the documentary evidence and agreed with Dr. Pennington's opinion (Tr. 224–25). Dr. Ryan stated that there was no additional treatment in the record and that Selby did not allege a worsening of a previously-documented impairment or allege a new impairment (Tr. 177, 224).

On May 2, 2012, Pearline Butcher, D.O., performed a disability examination (Tr. 233–37). Selby reported back problems that began at age 16, neck pain that radiated into the left shoulder that began six months earlier, and shortness of breath that began seven to nine months earlier (Tr. 233). Dr. Butcher stated that Selby's blood pressure was elevated on examination (170/90) (Tr. 234, 236). Dr. Butcher stated that Selby appeared to be in moderate pain; had a normal gait; had a lesion on the right leg; had a positive Tinel's and Phalen's sign in both hands, grasp was weaker with the left hand; had neck pain to palpation and limited range of motion; had back pain to palpation and limited range of motion; and had a positive left straight leg raise test (Tr. 236). Dr. Butcher diagnosed back pain, neck pain, shortness of breath, tobacco abuse, elevated blood pressure without hypertension, and chronic pain (Tr. 236–37). Dr. Butcher stated that Selby was not in pristine health and should be examined by an internist; a gastroenterologist for rectal blood; an orthopedist for neck pain and possible carpal tunnel syndrome; and a dermatologist for right lower leg lesion (Tr. 237). Dr. Butcher wondered why there were not more medical records and stated that Selby could not get the care that he needed due to no income and no health insurance (Tr. 237).

On that same day, Dr. Butcher completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) (Tr. 238–43). Dr. Butcher opined that Selby could occasionally lift and carry 10 pounds; could not perform the sitting, standing, and walking requirements for a full workday; had limited use of his hands and feet; could perform no postural movements except occasional climbing of stairs and ramps and balancing; and needed to avoid many environmental hazards (Tr. 238–42). Dr. Butcher opined that these limitations were first present in 2009 (Tr. 243).

**B.    Selby's Hearing Testimony**

Selby stated that he had "something wrong with my back and my hip, and when I walk for any amount of distance, everything on [the left] side starts hurting and goes numb" (Tr. 31). He was not currently receiving any medical care on a consistent basis because he did not have the money or insurance (Tr. 31). His last medical appointment was with Dr. Butcher (Tr. 32). He did not return to other physicians due to a lack of money (Tr. 32). He estimated that he could stand for

forty-five minutes and walk from "here to the front of the building" (Tr. 33). He estimated that he could sit for about an hour because he gets tingling and pain in his hip and leg (Tr. 33). He stated that he could lift 20 pounds at a time, but could not do that on a continuous basis (Tr. 33).

C. **Vocational Expert's Testimony**

Katharine Bradford, M.S., testified at the administrative hearing as an impartial vocational expert (Tr. 36–42, 76). Ms. Bradford was asked to assume an individual (with the claimant's age, education, and past work experience) who was limited to light work with an inability to perform frequent bending and stooping; an inability to perform frequent squatting; an inability to operate foot controls on a frequent basis; and an inability to handle excessive vibration (Tr. 37–38). Ms. Bradford testified that such an individual could perform the occupations of assembler (6,600 jobs in Tennessee and 217,000 jobs nationally); machine tender (2,900 jobs in Tennessee and 128,000 jobs nationally); and grader/sorter (1,600 jobs in Tennessee and 63,000 nationally) (Tr. 38). Ms. Bradford stated that the number of jobs would decrease by 20 percent if the individual was unable to work at heights or around moving and dangerous machinery (Tr. 38–39).

Ms. Bradford testified that an individual would not be able to work based on Selby's hearing testimony or Dr. Butcher's opinion (Tr. 41–42).

(Doc. No. 13, PageID# 292–96.)

III. **Analysis**

A. **Legal Standard**

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by the Social Security Act, which empowers the district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the Commissioner to determine whether substantial evidence supports the agency's findings and whether the correct legal standards were applied. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Gentry v.

6

Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014). The Court also reviews the decision for procedural fairness. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Id*. at 723. Failure to follow agency rules and regulations, therefore, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (quoting Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011)).

The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See* Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record . . . [but] 'must take into account whatever in the record fairly detracts from its weight.'" Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The Commissioner considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Miller*, 811 F.3d at 835 n.6; 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." Johnson v. Comm'r of Soc. Sec., 652 F.3d 646, 651 (6th Cir. 2011).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the agency must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)). The agency can carry its burden at the fifth step of the evaluation process by

relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See* Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids function only as a guide to the disability determination. Wright, 321 F.3d at 615–16; *see also* Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the agency must rebut the claimant's prima facie case with proof of the claimant's individual qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; *see* Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

### C. Plaintiff's Statement of Errors

#### 1. Independent Medical Examiner Dr. Butcher's Opinion

Selby first argues that the ALJ erred in rejecting the opinion of the independent medical examiner, Dr. Butcher, without providing any reasonable basis for doing so. The ALJ first considered Dr. Butcher's May 2, 2012 report in the context of determining Selby's severe impairments at step two of the sequential evaluation. He found that no medical impairments were established by Dr. Butcher's report because the record lacked objective support for, or was otherwise inconsistent with, the impairments that Dr. Butcher diagnosed. (Tr. 15.) The medical exhibits that the ALJ weighed against Dr. Butcher's opinion at step two and again in determining Selby's RFC are the September 21, 2010 treatment note of Dr. Bolton and the February 14, 2011 report of consultative examiner Dr. Keown (the only other clinical evidence in a sparse medical record). (Tr. 15, 17–19.)

As the ALJ noted, Selby presented to Dr. Bolton complaining of the recent onset of intermittent pain in his left hip and numbness in his left leg and was diagnosed with mild-to-moderate degenerative joint disease of the left hip. (Tr. 207.) Dr. Bolton prescribed the steroid Prednisone with instructions for Selby to return to care if the Prednisone did not help. (*Id.*) Selby did not return for further treatment with Dr. Bolton. Several months later, when Selby presented to consultative examiner Dr. Keown for an examination, Dr. Keown opined that, despite a slight limp and somewhat reduced range of motion in the left hip, Selby apparently did not require any medication or other treatment for pain and could be expected to perform a significant range of heavy work. (Tr. 209–17.) Giving some credit to Selby's subjective complaints, the ALJ determined that an RFC for medium work with some postural and environmental restrictions was consistent with the physical examination findings of Dr. Bolton and Dr. Keown. (Tr. 17–19.) In doing so, he weighed Dr. Keown's opinion that Selby could perform heavy work, the opinions of nonexamining consultants that Selby had no severe impairments, and Dr. Butcher's assessment that Selby's exertional, postural, and environmental limitations would preclude even sedentary work.

The ALJ's weighing of the conflicting medical opinions and his resulting rejection of opinions at the extremes in favor of a middle ground is supported by substantial evidence. It is the province of the ALJ to resolve such evidentiary conflicts, and where the ALJ's resolution is supported by substantial evidence, this Court may not second-guess it. Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713–14 (6th Cir. 2012). While Selby argues that Dr. Bolton's diagnosis of mild-to-moderate degenerative joint disease is consistent with Dr. Butcher's assessment of severe limitations on Selby's ability to sit, stand, walk, and engage in postural activities, the ALJ properly found that the two are consistent only to the extent that Selby's impairments could reasonably be

expected to have caused the symptoms he experienced. (Tr. 17.) The ALJ found that Selby's testimony regarding the limiting effects of those symptoms was not credible, however, to the extent they conflicted with a medium work RFC. (*Id.*) Otherwise, the proposition that mild clinical findings are consistent with severe functional limitations is not supported by this record, and the ALJ appropriately found Dr. Bolton's diagnosis and Dr. Butcher's assessment at odds with one another.

Moreover, the ALJ sufficiently explained his resolution of the conflict between these items. An ALJ is not required to give "good reasons" for rejecting the opinion of a one-time consultant like Dr. Butcher; that procedural mandate extends only to the ALJ's consideration of a treating source opinion. Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 876 (6th Cir. 2007). The ALJ gave full consideration to Dr. Butcher's report, discussing at length her findings and the conflicting evidence from Dr. Bolton and Dr. Keown. (Tr. 15, 18.) No more particular rationale is required when determining the weight due to the opinion of a non-treating source. *See* Norris v. Comm'r of Soc. Sec., 461 F. App'x 433, 439–40 (6th Cir. 2012). While Selby argues that the ALJ should have accounted for the fact that his hip and leg conditions progressively worsened and that the opinions of Dr. Bolton and Dr. Keown were rendered a year or more before that of Dr. Butcher, he cites no record evidence to support a finding that his limitations worsened significantly in that time frame. The Court finds no error in the ALJ's rejection of Dr. Butcher's opinion. To the extent that Selby's remaining arguments regarding the ALJ's determination of his credibility and his RFC rely upon Dr. Butcher's, those arguments must fail. (Doc. No. 12-1, PageID# 285–89.)

### 2. The ALJ's Determination of Selby's Credibility

Selby further asserts that by finding his allegations less than fully credible, in part because "[t]he record shows very little medical treatment" (Tr. 17), the ALJ failed to account for Selby's

11

explanation that his inability to afford medical treatment caused the scarcity of medical evidence in this case. However, the ALJ did take account of Selby's testimony that, "[w]ith regard to his lack of medical care, [Selby] testified that he has no insurance and no money." (Tr. 16–17.) The ALJ found, however, that "the medical evidence that is in the record does not support the severity of the symptoms and limitations alleged by the claimant." (Tr. 17.) The ALJ thus determined Selby's credible symptoms and RFC based on the evidence that Selby did present, not on any lack thereof. (Tr. 19.) Accordingly, the ALJ did not improperly view Selby's failure to seek treatment as conflicting with evidence that would otherwise support his disability claim. Instead, he found that Selby "failed to meet his burden of establishing the existence of a disability, a burden for which the Commissioner requires 'medical signs and laboratory findings.'" Watters v. Comm'r of Soc. Sec., 530 F. App'x 419, 424 (6th Cir. 2013).

### 3. The ALJ's RFC Determination

Finally, citing SSR 96-8p, Selby argues that the RFC determination should have included a function-by-function assessment of his exertional abilities in order to resolve the conflict between Dr. Butcher's assessment and the ALJ's finding of his capacity for medium exertional work. While SSR 96-8p "requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547 (6th Cir. 2002). Instead, "the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Id.* (quoting Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (table), No. 00-1995 (3d Cir. Dec. 19, 2000)). As discussed above, the ALJ addressed Selby's exertional and nonexertional capabilities, making reference to the evidence that supported his

conclusions. The ALJ's RFC determination evidenced his sufficient consideration of Selby's functional abilities and complied with SSR 96-8p. *See* Rudd v. Comm'r of Soc. Sec., 531 F. App'x 719, 729 (6th Cir. 2013).

In sum, the Court finds that Selby's allegations of error do not warrant reversal in this case. The decision of the ALJ is supported by substantial evidence on the record as a whole. That decision will therefore be affirmed.

**IV.    Conclusion**

In light of the foregoing, Selby's Motion for Judgment on the Administrative Record (Doc. No. 12) will be **DENIED** and the decision of the Commissioner will be **AFFIRMED**.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE